MONROE, J.
Plaintiff on December 2, 1909, entered into a contract with W. T. Carey & Bro. for the' building of a two-story garage, but, after some progress had been made in the work, it concluded to erect a three-story building and on March 8, 1910, entered into the contract out of which this litigation arises; the reason for mentioning the first contract being that it is, in respect to most of the matters involved in this suit, made part of the second. The price agreed on in the last contract was $35,716, to be paid in installments and under certain conditions, and it was stipulated that the contractors should deliver the building complete by July 1, 1910, otherwise that plaintiff should deduct from the amount due them $35 per day for every day that they should be in default. This suit was instituted in July, 1911, and its purpose was to call the contractors and their surety and creditors in *451 concurso and obtain a judgment distributing the balance which may be due under the contract and to have ajudicated certain differences which had arisen between the parties in connection with the work. Plaintiff alleges that the contract was duly recorded and that it paid, in accordance with its terms, various sums, aggregating $29,795.06, leaving a balance unpaid of $5,920.94; that the contractors failed, in different respects, to comply with their obligations, and, upon their refusal on August 13, 1910, to prosecute the work, were notified, as was also their surety, that plaintiff would take charge, and that it thereafter completed the building at a cost of $4,650.73, leaving due, under the contract, the sum of $1,270.21, which it tendered and deposited in court. Plaintiff further alleges that there is due it, to be paid either from the fund deposited in court or by the contractors and their surety, the sum of $1,085 as demurrage for 31 days (from July 1st to August 1st) at $35 per day; and, to be paid by the contractors and their surety, the further sum of $500, as the fees of its attorneys for services in this proceeding. It further alleges that attested accounts, to the amount of $15,091.54, have been served on it, and the petition gives the names of the furnishers with the amounts claimed by them, respectively. The prayer is for the citation of the contractors and their surety (the National Surety Company) and the furnishers of labor and material, and for judgment ordering the cancellation of the liens and privileges recorded against the building and decreeing, plaintiff to be entitled to be paid, either from the fund on deposit or. by the contractors and their surety, the sum of $1,085, and that it be allowed $500 attorneys’ fees and costs.
W. T. Carey & Bro., composed of Walter T. Carey and Thomas Carey, Jr., admit the contract sued on and allege that they complied with its conditions. They allege that changes were made in the plans and specifications, which occasioned the delay of which plaintiff complains, and they deny that they are liable for demurrage. They allege ' that plaintiff’s architect refused to permit them to put the “topping” on the concrete flooring slabs until the latter had become dry and hard, and is improperly deducting from the amount due under the contract the cost of relaying the same at an enormous expense, and that plaintiff itself was in default in making payment under the contract and was in no position to put defendants in default. They further allege that they are entitled to the following amounts for extra work and material, to wit: $560 for adding an extra inch of cement “topping” to the thickness of the concrete flooring slabs; $50 for taking up and relaying driveway; $25 for removing catch basin; $150 for enlarging two columns and girders; $15 for closing an opening in a party wall — making a total of $800; and they pray for judgment for $6,720.94.
The National Surety Company admits that Walter T. Carey & Bro. made a contract with the “Equitable Real Estate Company” for the construction of a building therein specified, which contract is annexed to plaintiff’s petition, and that it executed the bond annexed to the petition, as surety for the contractors and in favor of the company, but it denies that it is liable on the bond to the plaintiff herein for the reason (as developed later on) that the name of the plaintiff is “Equitable Real Estate Company, Limited.” Further answering, it alleges that the amount due by the plaintiff to the contractors for work and material furnished in the construction of the building in question is sufficient to discharge all claims arising under the contract, and it denies that any of the parties setting up claims herein have any right of action against it.
Plaintiffs’ counsel say in their brief:
“We will not discuss the claims of the individual materialmen.”
*453 And, in fact, plaintiff specifically admits tlie correctness of most of those claims. On the other hand, the contractors, in effect, admit, and their surety doej not seriously deny, that plaintiff paid ont, under the contract, $29,795.06 prior to the alleged default, and they admit that plaintiff made the payments, amounting to $4,650.73, after the alleged default, as set forth in Exhibit 6, made part of its petition, though they deny that all of the payments were called for by the contract. The payments thus referred to were made to the parties named below as follows:
Albert Weiblin Marble & Granite Company, stair treads ................................. $ 11 60
J. Gordon Sargent, paving...........$600 00
“ " “ “ 900 00
“ « “ “ 750 00
“ « " « 56 53
- $2,306 53
Crescent City Auto Company, Limited, demurrage, July 1 to July 31, 31 days, @ $35
per day ......................................$1,085 00
Leovy Plumbing Company, plumbing........ 22 55
J. M. Richardson, electric wiring........... 14 00
S. Nosacka & Son, wire work — '............ 349 92
Juo. T. Pender, touching up whitewash, damaged by pavers, $25, painting sprinkler tank, $14................................. 39 00
J. Joachim Company, Incorporated, electrical work .................................. 115 00
American Sheet Metal Works, one light glass in skylight............................ 5 00
Kinnear Manufacturing Company, steel rolling doors ................................ 235 00
Otis Elevator Company, automatic gates... 84 00 H. P. Grimm, furnishing and erecting
channel frames for Kinnear doors......... 39 97
Albert Weiblin Marble & Granite Works, furnishing, checking, and fitting stair treads ........................................ 42 06
Douglas Electric Construction Company, electrical work .............................. 14 75
H. W. Bond & Bro., repairing plaster damaged by pavers.............................. 11 00
S. A. Calongne & Son, “odds and ends”..... 275 35
Total .......................................$4,650 73
[1] 1. Considering the questions whether the contractors defaulted in the matter of the completion of the building within the time agreed on, and whether they should he held liable for the demurrage charged against them, we find the facts to be as follows: The contract called for the delivery of the building complete on July 1st, and it is not pretended that it was then delivered or was ready for delivery. Having been leased to the auto company, plaintiff paid that company demurrage from July 1st to August 1st, inclusive, at the rate of $35 per day, or a total of $1,085; but as the auto company went into possession on or about August 1st, though the building was still incomplete, no claim for demurrage was thereafter made by it, and no such claim is made against the contractors, the demand of the plaintiff being limited to the amount actually paid out. The contractors deny liability for any demurrage, alleging that tbe delay was attributable to the acts and omissions of plaintiff’s architect, and considerable testimony was admitted, over plaintiff’s objection, in support of that allegation. The contract contains the following .stipulation:
“Art. 8. Should the contractor be delayed in the prosecution and completion of the work, by the act, neglect, or default of tbe owner, or the architect, * * * then the time herein fixed for the completion of the work shall be extended for a period equivalent to the time lost, * * * which extended period shall be determined by the architect; but no such allowance shall be made unless a claim therefor is presented, in writing, to the architect, within forty-eight hours of the occurrence of the delay.”
It is admitted that no written claim for .an extension of time was made during the execution of the contract; but it is argued, upon the basis of the testimony to which we have referred, that the contractors were delayed by the architect, and thereby became entitled to an extension of time exceeding that for which the demurrage is claimed, and that an allowance on that account should now be made by the court. The function of the court, however, is to interpret the contract, where interpretation is required, and otherwise to enforce it as written, and the stipulation that no allowance of time shall be made “unless a claim therefor is presented, in writing, to the architect, within forty-eight hours of the occurrence of the delay,” *455 requires no interpretation, but is to be enforced as written, from which it follows that, in view of the admission that no claim in writing was made as thus provided, the testimony offered to prove merely that delays occurred, upon which such claims might have been predicated, was irrelevant and should have been excluded on plaintiffs’ objection. Even, however, if that testimony could be considered, for the purpose for which it was offered, we find it unconvincing. At the beginning of the work the contractors were using a cement of their own selection, which the architect accepted, with the understanding (implied, if not expressed) that it should prove satisfactory, but it proved to be very slow in “setting,” and some delay occurred in waiting upon it in order to ascertain whether it would set at all or whether it would be necessary to take out the foundation wall and piers in which it had been used. The contractors speak of “two or three weeks” as the time during which the excavations were left open, which was a loose way of testifying upon a matter concerning which they could and should have been exact, since, according to their foreman, the exact time lost might have been ascertained by reference to their time books. The foreman himself seemed barely willing to testify that “more than one day” was lost in waiting for the architect to inspect the forms in which certain columns were to be molded and gave no information about the other alleged delay. The contractors could in no event have expected the architect to allow them to impose the superstructure of the building upon the foundations put in by them until he became assured that those foundations would discharge their functions, and whatever delay may have been necessary to obtain that assurance was chargeable to them, and it was so conceded, as we take it, since it does not appear that they, at the time, made any pretense to the contrary, or claimed any extension of time in writing or otherwise. The testimony as to the delay of the architect in inspecting the forms is equal? ly inconclusive. He had the right, and it was his duty, to inspect the forms before the cement was poured in in order to see that they were properly constructed and contained the steel rods as required by the contract ; and, though he may not have been at hand upon every occasion when the contractors were ready with a particular form (there having been some 29 or 30 of them), it is by no means clear that the general work was thereby necessarily delayed. At all events, no such complaint was made at that time, and the same thing may be said of the alleged enlargement of two columns.
The delay in the delivery of the brick was attributable to the contractors, according to their own testimony, from which it appears that they ordered it to be delivered in three lots, at intervals of a week; that the first two lots were delivered in ample time; and that the shipment of the last lot was delayed by the manufacturer for some reason not explained and with which it is not pretended that the architect had anything to do. The contractors were at liberty to have ordered all the brick to be delivered at one time, and, so far as we can judge, would, in that case, have received it when the first lot was delivered. It is said that the architect late in June ordered that an elevator door, óf a particular kind, be substituted for one previously selected, which is true; but the contractors are not charged with any delay on that account.
It is also said that after July 1st the architect ordered that plaster be substituted in certain places for whitewash, the latter having been already applied according to the contract, which is also true. But we find that on July 22d the architect gave a certificate to plaintiff reading in part as follows:
*457 “This is to certify that your contractors * * * are not prosecuting the work with sufficient diligence to deliver the building within a reasonable time, although liquidated dam-. ages are accumulating against them since July 1st, when the building should have been delivered. * * * I therefore advise that you avail yourself of your rights under article No. 5 of your contract, notify Messrs. W. T. Carey 6 Bro. that, at the end of three working days from the date hereof, you will terminate their employment, enter in upon the premises and complete the work included in this contract at his expense. * * *”
The notice having been given as suggested, the contractors, on July 25th, wrote to plaintiff, and also to the architect, saying, among
other things (in letter to plaintiff):
“The building is substantially completed. All that is necessary to literally complete the build ing is about as follows: (1) The stairs have not yet been put in, but the elevator is ready and running to-day. * * * (2) The wire partitions around the elevator holes are missing, but the work of setting these will be started to-day. (3) Pour large plate glass at the corner of Dryades and Lafayette are missing. These will likely be installed to-day. (4) The iron hangers on the front doors are being put in, which will enable us to put in the small lights today. (5) The installation of the electric fixtures is progressing and will likely be completed by to-morrow.”
In letter to architect:
“Your rejection of the entire first floor pavement in this building is unreasonable and arbitrary and we will not acquiesce in it. This floor was laid under your supervision and inspection, and the last piece of it was laid some six or eight weeks ago, prior to the period of July 1st when this building should have been completed. Your letter of July 20th is the first intimation to us that you would reject this building. The floor is laid strictly according to plans and specifications, and of proper material, and we decline to accept your rejection. * * * With regard to the second and third floors being improperly laid, we have to say that you are wrong. This flooring was laid strictly in accordance with your specifications, was washed with a hose, steel brushed, and washed with acid. The proper way to lay a cement topping is to lay it on concrete before the concrete has set. If you require the topping put on after the building is erected, the risk of the topping not adhering to the concrete is on you and not on us, provided we do the work strictly according to plans and specifications, and we are prepared to prove that we have done this strictly according to plans and specifications. We allowed you to condemn a great many squares of the pavement on the second and third floors, and, in many instances, have gone to the expense of taking up this flooring and relaying it for you, but we now decline to take any more, as your rejection practically amounts to the entire flooring. * * * The building is substantially completed, under the law, as there is only lacking the stairs, the wire partitions around the elevators, four plate glass at the corner of Dryades and Lafayette, and the small lights in the front doors. With regard to the automatic gates, the contractor informs us that it is impracticable, on account of the lowness of the ceiling, to put in the gates demanded by the specifications. We are, however, not responsible for the delay in this particular. The doors for the elevator shaft were changed by you and you agreed to wait until we could substitute other. doors for you.”
On July 26th the contractors, through their counsel, wrote to plaintiff, saying:
i "We desire to supplement our letter of yes- terday by calling your attention to the fact that the specifications * * * contain a maintenance clause which obligates us to remedy : any defects in our work for a period of one year after completion of the same. The action of the architect relative to the floors is covered | by this maintenance guaranty, and we are obi ligated, in the event that the floor proves de- ' fective at any time within that period, to correct the same, which we will do.”
On July 28th the architect wrote to the contractors (quoting in part):
“I have your letter of July 25th referring to our complaints and rejection of work in J;his 'building. I note that, since I wrote * * * on July 22d certifying that you were not working with due diligence, * * * before the three days had elapsed for your ejection from the works you made every effort to prosecute the work diligently, and we are therefore now willing to allow you to proceed as contractor, as heretofore.”
The letter then refers to defects in the floors and continues:
“I therefore demand that you place a large force of men repairing and cutting out such squares as were designated by myself as bad and remove and replace the same. * * * Your claim that the building is substantially ! complete, under the law, is ridiculous and ab- ! surd. To-day at the moment of writing you are still placing the stairs, for which I understand the order, properly vouched for, was given within the last two weeks.”
On July 29th the architect wrote to the contractors:
“This is to notify you that there is a crack in Beam B. 2, betwéen columns 21 and 22, un *459 der the roof.. Also there is another crack in Beam B. 1 between column 18 and brick wall, under the roof. Therefore do not allow any one to fill the tank, sprinkler system, until further notification. This tank rests directly over last-mentioned beam. Both of the columns supporting these beams must be enlarged, so as to correct that defect and to sustain your guaranty when you contracted to put this building up under the Trussed Concrete Steel Co.’s plans and specifications.”
[2] On August 13th the contractors were again notified that, at the expiration of three days, plaintiff would take charge of the work, which it did; and thereafter there was some further correspondence upon the subject of the floors, in which the contractors took the position that, the tenant having gone into possession of the building, it was too late for the owner to complain that it was not completed, and that its only remedy was to call on the contractors, under the maintenance clause of the contract, to make good defects which might have appeared after its completion. In two of those letters, of date August 22d and August 29th, the contractors, who had been notified that the cement flooring was to be taken up and relaid (or their counsel), say:
“We have demanded of you a clear specification of wherein the work is defective, and we have told you that we would, at once, inspect it, and, if found to be as you represent, we would at once repair it, under the maintenance clause of the contract.
* * * * * * * •
“I personally went over the building with W. T. Carey & Bro. and while there were a good many places that gave a hollow sound, particularly along the corners of the squares, yet the floors were strong and stable and, in my respectful opinion, did not justify the extraordinary action which you claim the right to take.
* ❖ * ❖ # * sfi
“W. T. Carey & Bro. took up a great number of squares that were claimed to be defective, and, in the presence of witnesses, washed them with acid, used the steel brush, washed them again, and sprinkled with neat cement, and some of those same squares are cracked and are hollow underneath.
# ❖ * * * * *
“There are a number of defective squares on the second and third floors which W. T. Carey & Bro. will quickly remedy, and will remedy
in your presence and in the presence of the architect, following his instructions to the letter.”
We think it quite evident, from the foregoing, that, apart from the plastering and the doors for the elevator, and apart from the cement topping for the floors, the building was not completed according to the contract certainly as late as July 28th, and it is not shown to have been completed even by the 31st of that month, or by the 13 th of August. The proposition that it was “substantially” completed when there were still lacking the stairway, the “wire partitions around the elevator holes,” four large plate glass from the show windows upon the street corner, the iron “hangers,” and small glass in the front doors, and the electric fixtures, appears to us to be untenable. We therefore conclude that plaintiff, in taking charge of the work and in demanding the stipulated demurrage for the 31 days of the month of July, is within its rights under articles 5 and 6 of its contract. As to the demurrage, however, as plaintiff included the $1,085, claimed on that account, in the $4,650.73 deducted by it from the balance of $5,920.94, it has no claim on the remainder of $1,270.21, which it deposited in court. Moreover the law governing the matter (Act No. 134 of 1906, §§ 1, 4) provides that:
“In the event that the owner has a claim in concursus with other claimants who have a lien and privilege under the provisions of this act, they shall be paid in preference to the owner.”
So that the $1,085 which plaintiff has retained in its hands should be added to the $1,270.21 which it has deposited in court, and it can share in the fund so created only after the other claimants, who have liens, shall have been paid.
[3, 4] 2. The question next to be considered is whether plaintiff has the right to deduct, from the balance called for by the contract, the amount paid by it for relaying the ce *461 ment “topping,” constituting the floors of' the building. It is conceded by the contractors that they were bound to lay one inch of cement topping upon the concrete flooring slabs upon each floor of the building, and it is also conceded that, according to the contract they were to lay on the topping after the concrete had set; but their contentions are that the one inch of topping was included in the thickness of the flooring slabs (T% and 8% inches, as laid on different floors) called for by the structural design, agreeably to which the building was to be erected; and that the proper method of doing the work (but which method the architect would not permit them to adopt) was to lay the topping on the slabs before the concrete had set, and not afterwards. Plaintiff’s contentions, on the other hand, are that the structural design presented by the contractors and accepted by it called for 7% and 814 inches of concrete, and that those thicknesses of concrete, irrespective of the topping, are integral and necessary parts of the calculation whereby the loads and stresses that the building is to bear are provided for; and that, so far from having overruled any suggestion of the contractors that the topping should be laid on the fresh concrete, its architect rather favored that method and yielded his preference to the suggestion of the contractors that it might more advantageously be laid on at a later period in order that the surface should not be injured by use during the subsequent building operations.
W. T. Oarey, according to his testimony, had just begun pouring the concrete slabs on the first floor when there occurred between him and Mr. Shepard, the architect, a conversation from which he seems to have drawn the conclusion that Shepard objected, not only to his making the slabs 6% or 7% inches thick (as the case may have been), but that he also, and at that time, objected to his laying on the topping immediately after pouring the concrete.
His examination, concerning what appears to have been the same interview with the architect, runs as follows:
“Q. Well, now, what is the proper way to lay a cement floor on a gravel concrete base? A. It is to put your concrete down and, before your concrete sets, put your topping on and finish it, right to-day, so that it will take and bind right together. Q. Now, will you state to the court what Mr. Shepard did, in connection with these floors, that prevented you from doing that? A. I had the first floor started there, and I had my strips up there, and Mr. Shepard came up and asked me what I was going to do; and I told him what I was going to do; and he said, ‘No, sir; they would not have anything like that;’ and I said, ‘Let me explain it to you, and we can talk it over. I just came from doing a job like that on Baronne street, and it proved up fine.’ He said, ‘Where?’ I said that Toledano & Wogan were the architects, and that it held up. He said, ‘Never mind about Toledano & Wogan; I am running this, and I want it down my way, and I don’t want it done that way.’ I said, T will have to do it your way, I suppose;’ and he said, ‘Yes, you will, unless you will have to get off the job; one or the other.’ ”
A little farther along, still on his direct examination, he testified that, according to his understanding, the structural design, showing the concrete flooring slabs to be 7% and 8% inches thick, included the topping, and that he had begun pouring the slabs so as to allow for the topping (that is to say, an inch thinner than as called for by the design), when Mr. Shepard appeared; and the examination proceeds:
“Q. What argument or discussion took place between you when you actually started to do this work? A. I was starting on the river, uptown, corner, and had poured a couple of panels. * * * Of course, it was fresh. Shepard had brought his engineers there that evening, * * * and he said, T want 8% inches, according to the plan, and I want 7% inches, according to the plan.’ I said, ‘That allows the top; I am taking that off for the top.’ He said, ‘No, you don’t do nothing; if you don’t do that, I will condemn the whole job, and I am going to run you off from it; take the job away from you.’ I said, T will do it but I will make you pay for it.’ He said, ‘Go ahead and make me.’ ”
*463 It appears natural enough that the discussion as to thickness of the concrete slabs should have taken place when the pouring of the slabs began, but there was no reason why, just at that moment, the contractor and the architect should have also entered into a dispute upon the question whether the topping should be put on before the setting of the concrete or afterwards; and in view of the testimony of Shepard, as given below, we are of opinion that Mr. Carey is mistaken in that respect. The concrete slabs were, however, made and 8]4 instead of 6% and 7U,, inches thick, as the contractor intended, and nothing more seems to have been said or heard of the matter until this litigation arose; there being no mention of it, so far as we now recall, in the somewhat voluminous correspondence in which the parties engaged. The claim which the contractors now set up is that they are entitled to $10 per square yard, or $560, as the value of the topping; but it is clear that at most they would be entitled to the value of 560 square yards of concrete, one inch thick, which, as we take it, would not be so great as the value of 560 square yards of topping either as to the material or the labor.
Mr. Shepard, the architect, however, and Mr. Joor, a civil engineer, construe the contract and structural design to mean that the topping is to be added to the concrete slabs, and, the testimony and circumstances considered, we think that view is sustained. Upon the question whether Mr. Shepard objected to the laying on of the topping immediately after the pouring of the concrete, he says:
“I have a distinct recollection of talking to Mr. Wallis (Walter) Carey on that thing — on that very point — and he was the one who requested me to let him go on and finish the building, and then put the topping down afterwards. I rather objected to this and have always thought that (in) a steel building it is always better to put the topping on immediately after-wards — after the slab is laid — than to wait. They claim that they can get on with the building faster, because it mars the topping to go and work on top of it. * * * There is some danger [that the topping will not form a bond with the concrete after the latter has set], but, if the work is properly done, it will not occur. That is evidenced by the fact that it is sticking now, and all other work in a similar way, here in the city, wherever it is done properly, * * * stays put.”
The character of the topping as laid by the contractors, and its condition when the auto company went into the building, and after the contractors had attempted to remedy the defects, are referred to in the letters which have been quoted and are shown by the following testimony, ,to wit:
By Mr. Parkhouse, representative of the auto company:
“Q. Was the cement done at the time your people moved in? A. Yes, sir. Q. Did you make any complaint with reference to the flooring? A. Yes, sir; we did. Q. What was the nature of your complaint? A. The flooring was hollow by walking over it; you would notice a different sound; and, when we went to sweep up the floor, we would simply sweep the cement. We clean our shop every evening at 5 o’clock, and, in cleaning the floor, why you could sweep all of it off and would never finish sweeping the dust, so that we swept the cement right off the floor, and I called Mr. Shepard’s attention to it. Another thing we objected to was that the line dividing the cement — I don’t know what you call it, but where they had the paper on the cement in the building — was running in all directions. It was a joke to people in there. They would look around and say, ‘Good gracious, who laid this floor;’ and we rejected it. Q. Was it subsequently relaid? A. Yes, sir. Q. Do you know by whom? A. Mr. Sargent, I believe. Q. How is it now? A. It is all right now; we have not had any trouble with it since.”
On cross-examination:
“Q. But they [the Careys] did take up a large number of squares on the floor? A. They did, but the ones that they laid down the second time were no better than the ones they took
Mr. Shepard testified as follows:
“On the first floor half the paving on the side towards Dryades street was very defective; the topping was not strong (that is, it dusted). By dusting, I mean it would wear off under ordinary usage, evidently due to lack of cement. The lines were not drawn straight. I mean by that that the lines subdividing the slabs of paving were not true and very unsightly. The paving was not to grade, and, if I *465 remember, it held water in spots. * * * The bottom of that paving also was of an inferior character, and my attention was called to this a. number of times by Sargent’s workmen, due to the lack of proper ingredients. * * * .The topping of the other floor * * was entirely defective, practically speaking. There might 'have been a few slabs that could have remained down, but it would have been impracticable to have let those remain. This paving dusted; * * * the proper ingredients of cement and sand were not placed in it; and it was not properly subdivided. The concrete floor below * * * was not as clean as it should have been, and Sargent’s workmen, in taking up Oarey’s defective work, a number of times called my attention to the dirt that was left on the concrete structure, making it impossible to form a proper bond, showing that Carey did not clean the structure as he should have. This defective paving comprised practically all the paving of the second and third floors. The lines * * * were done in a very bad manner, * * * and some of this topping, after it was taken up, crumbled; 'a great portion of it crumbled like chalk; you could break it with your fingers.”
Mr. Sargent testifies that he relaid the floors of the second and third stories entirely, and that of the first story in part; that he relaid no more nor less than as directed by Mr. Shepard; that he was paid the cost of the labor and material, plus a commission of 10 per cent.; that the bills for labor and material were reasonable, “the accustomed prices,”- the owner having accepted the lower of two bids for the supplying of the material.
The contractors testify that they did the best they could to please the architect, but were unable to do so, and generally that the trouble with the paving arose from the fact that “they were compelled by the architect to wait until the concrete had become dry and hard before laying the cement on it.” Counsel for the contractors says in his brief:
“The fact that Gordon Sargent’s work was acceptable proves nothing. The uncontradicted evidence is that Shepard would not allow Carey & Bro. to lay the floors the right way — before the concrete set — and hence he and the owner cannot charge the Carey boys with the cost of relaying those floors, especially when it is shown and admitted that they went out of their way to please Shepard and took up and relaid 100 squares, only to have Shepard, after the default, take up all of the work again.”
The statement that “the uncontradieted evidence is that Shepard would not allow Carey & Bro. to lay the floors the right way — before the concrete set — ” is answered by the excerpt above given from the testimony of Shepard. And the fact that Sargent’s work was free of the defects that were found in the work of the Careys proves that the work could have been properly and effectively done even though the topping was put on after the concrete had set. Beyond that it is quite evident that the lack of the proper proportion of cement in the mixture used by the Careys and the irregularity of the lines in the paving had nothing to do with the time at which the paving was laid. We therefore conclude that the paving, as laid by the Careys, was properly removed, and that they are liable for the cost of replacing it.
3. Of the other amounts paid out by plaintiff, after the default, the contractors, through the brief filed in their behalf, admit their liability for the following, to wit:
S. Nosacka & Son, wire work.........$337 92
American Sheet Metal Works, one light glass ............................ 5 00
Kinnear Manufacturing Company, steel rolling doors...................... 235 00
Otis Elevator Company, automatic gates S4 00
H. E. Grimm, channel frames for Kin-near doors........................ 39 97
Albert Weiblin Marble & Granite Works, painting, etc., stair threads.. 42 06
Total ..........................$743 95
With regard to the remaining amounts so paid out, we find as follows:
Albert Weiblin Marble & Granite Company, stair treads...................$11 60
Payment of this item appears to have been included in the $42.06 paid to the Weiblin Company as per its contract with W. T. Carey & Bro., and was therefore an overpayment.
Leovy Plumbing Company, plumbing.. .$22 25
*467 Mr. Shepard testified that:
“In putting down this topping by Gordon Sargent some of the gas fixtures had to be removed, and one of them was broken, and this bill was for that, according to my recollection.”
The testimony does not sustain the cha'rge, as we are unable to distinguish between the plumbing which had to be removed and that which was broken.
J. M. Richardson, electric wiring......$14 00
The work thus charged for consisted in changing the position of an electric outlet in one of the columns which it became necessary to enlarge in order to take up a crack which developed in the beam which the column supported. The charge is therefore a proper one.
S. Nosacka & Son (difference between $337.-92 admitted and $349.92 paid)........$12 00
It appears to be conceded that this is an “extra,” for which the contractors are not liable.
John T. Pender, painting work damaged by paver and painting sprinkler tank. .. .$39 00
[5] We are of opinion that the $14 of this item, charged for painting work damaged by pavek, should be charged to the paver. As to the balance of $25 charged for painting the sprinkler tank, the architect is unable to' say whether the rusting of the tank made its appearance after he had accepted the sprinkler system put in by the subcontractor or before.
The claim against the contractors is therefore not sustained.
J. Joachim Company, Incorporated, electrical work.........................$115 00
Of this amount $90 is charged “for installing electric wiring to run the compressor for the tank and sprinkle'r system,” which is said to be necessary for a complete sprinkler system. The General Eire Extinguisher Company contracted with Carey & Bro. to install the sprinkler system complete, and we infer from the testimony that it was engaged in that work when plaintiff took charge and completed it afterwards. At all events, it is now before the court demanding $2,-498 as for a completed job, and plaintiff is not disputing the correctness of the charge. Moreover, the evidence does not show satisfactorily that the electric wiring here charged for is a necessary part of the sprinkler system. The charge of $90 cannot therefore be allowed. As to the remaining $25 contained in the item under consideration, the architect is unable to say what it was paid fo’r.
Douglas Electrical Construction Company, electrical work.....................$14 75
It is not shown that this amount was paid for anything for which the contractors are responsible.
I-I. W. Bond & Bro., repairing plaster damaged by paver .....................$11 00
This should have been charged to the paver.
S. A. Calongne & Son, “odds and ends” ...........................$275 35
In regard to this item, Mr. Shepard gives the following testimony:
“That bill generally was for repairing in and about the building. Mr. Calongne put in some concrete work — columns that were necessary due to the beams that were cracked. Now he did some other work, repairing window sills that were leaking; right now, without further refreshing my memory, I could not say what the other work was for.”
On his ckoss-examination he said:
“A part of this payment was made to Calongne for repairing two of the columns on the third floor; that is, rebuilding two columns on the third floor and repairing a certain portion of the concrete that had come loose; * * * the beam concrete, the concrete on the under side of the beam, sticking to the middle. The partition needed repairs and the windows needed repairs and I believe there was drain pipe work done; I am not sure of that. * * * This is his cost, plus commission. * * * That is the only bill I have. * * * That [on a general statement, ‘Due for October,’ etc.] is the way I paid Mr. Calongne in a number of instances.”
*469 A.s this court is in no better position to determine what proportion of the amount paid Mr. Calongne should be charged to the contractors than the architect, by whose order he was paid, this item cannot be heire allowed.
4. The contractors claim $560 for adding the topping to the concrete and thereby increasing, by one inch, the thickness. of the floors, as they allege, beyond that called by the contract. This item has already been considered, and we have but little to add to what has been said.
The specifications of the contract under which the building was elected contain the following, among the “addenda and modifications,” to wit:
“Beinforced concrete framework shall be substituted, according to the design of the Trussed Concrete Steel Company, of Detroit, Mich., and as permitted in the aforesaid specifications, for the alternate bid, instead of structural steel design with the reinforced concrete and fireproofing, as shown on the original plan and specifications. The intention is that the Trussed Steel Company’s design shall, in all respects, take the place of the design for structural steel frame, as shown on plans prepared by Shepard & Biblet, architects. All reinforced concréte that is not necessarily included in the design of the Trussed Steel Company, but which is necessary for the purpose of this building, and is part of the detail and original plans of Shepard & Biblet, architects, shall be considered as included. ' «
“The contractor, having submitted the additional mentioned design for the reinforced concrete framework, shall guarantee the design to fulfill the purposes of the structure, and the reinforcement is to have loadings and stresses as mentioned below. He shall guarantee that all reinforcement shall be according to the standard specifications of the Trussed Concrete Company, and that the stresses under working conditions shall not exceed those used in checking the above mentioned reinforced concrete plans.”
The design of the Trussed Concrete Company, which was submitted by the contractor, was for structural work alone and called for concrete floor slabs 7% and 8% inches thick, and the contractors insist that the topping was included, and hence, that it would have been a compliance with the contract for them to have made the slabs 6V2 and 7% inches thick and to have made up the difference with one inch of topping. The evidence, however, shows that flooring, whether of plank or other material, is not included in a structural design, and it suggests a doubt as to whether concrete floor slab 6% or 714 inches thick, with 1 inch of topping, have the strength of such slabs 7% or 8% inches thick, and plaintiff sought to prove that they have not the strength called for by the design submitted by the contractors, but was denied that privilege. We are of opinion that the testimony should have been admitted, but that without it the case against the contractors is made out, and that they were properly required to add the topping to the floor slabs called for by the design submitted by them.
The contractors claim $150 for enlarging two columns and girders, but the claim is not sustained by the testimony, from which, though it is somewhat confused, it appears that they enlarged one or more columns to protect the building from cracks which developed in the overhead beams, supported by the columns, and which cracks were attributable to faulty construction.
They also claim $50 for taking up and relaying a driveway, $25 for removing a catch basin, and $15 for closing an opening in a party wall; and the evidence sustains those claims.
5. The National Surety Company submits the propositiou that the bond sued on was made in favor of the “Equitable Beal Estate Company,” whereas this suit is brought by the “Equitable Beal Estate Company, Limited.”
[7] The bond appears in the transcript upon the page next following that bearing the signature to the contract of March 8th (which is signed by the “Equitable Beal Estate Company, Limited,” designated in the contract as the “owner”); it was recorded, with the *471 contract, on March 9th, and it runs in favor of the “Equitable Real Estate Company, owner, and all subcontractors, workmen, laborers, mechanics, and furnishers of material jointly, as their interest may appear and as hereinafter set forth, in the full sum of $17,858; * * * » the condition being:
“That if the said W. T. Carey & Bro. shall truly and faithfully execute and perform all the obligations undertaken by him in the foregoing contract, and shall pay all subcontractors, workmen, laborers, mechanics, and furnishers of material, this obligation shall be void, otherwise it shall be and remain in full force and effect. It is hereby agreed and understood that this bond is intended to be the statutory bond required by Act No. 134 of 1906.”
It is therefore a bond.taken by the “owner” in favor of the “owner and all subcontractors, workmen,” etc., as the law requires, and the error in the name of the owner, which is merely descriptive, is immaterial, particularly in view of the last pargraph above quoted.
The case of Netherlin v. Big Pine Lumber Co., 131 La. 981, 60 South. 637, is not in point.
[6] It is said that the purpose of the act of 1906 is to protect- the owner of the building from the claims of laborers and material-men; that the contest provoked by the suit authorized by the act is between the owner and the several- claimants who assert liens on the building, and “whose claims are to be tried in concursus”; that the contractor and his surety are proper parties, because the contractor has an interest, with the owner, in defeating unjust claims; but that the act does not authorize any judgment to be rendered against them (the contractor and his surety) because:
“A concurso * * * is a devise, in our system of procedure, whereby different parties, having an interest in a fund in the custody of the law, and to be distributed by the court, are summoned to contest in the distribution, contradictorily with each other. * * * There is nothing in the act [the counsel continue] which suggests that any other result can be brought about in such a suit than the determination of the amount for which the owner is liable, the amounts due the several claimants, and the rank of their privileges, if they have any. It necessarily follows that the claimants cannot recover any judgment against their co-defendants ; and surely they cannot against the surety upon the contractor’s bond any more than any other.”
Something more than half a century before the act of 1906 was passed, however, our predecessors in this court had decided that:
“The suit in concurso is a remedy, provided by state laws, to enable creditors to enforce their claims against a debtor.” Schroeder’s Syndics v. Nicholson, 2 La. 355.
Prom which it follows that even then the proceeding was not regarded as one in which the creditors were to be permitted merely to have determined inter sese, and as between them and their debtor, but without the right to obtain an executory judgment therefor, the amounts due them, and the rank of their respective privileges. The act of 1906 relates to building contracts in cities of over 50,000 inhabitants, provides “for the bond to be given therein for the protection of the owner, subcontractor, workman,” etc. It provides that such contracts, when reduced to writing and recorded within the prescribed delay, shall create a lien and privilege in favor of the parties mentioned; that the owner shall require a bond from the contractor, etc., which bond shall be “attached to, and recorded with, the contract,” and shall be conditioned for the payment of such parties, in the event the contract be not faithfully executed and the parties shall have recorded their attested accounts within a certain delay; and that if, at the expiration of that delay, there are such claims recorded:
“The owner shall file a petition in a court of competent jurisdiction, citing said claimants, the undertaker, the contractor, master mechanic, or engineer, against whom such claims are filed, and the surety on said bond, and the owner shall assert whatever claim he may have against any or all of them in said petition, and require said claimants to assert their claims, and all of said claims shall be tried in concursus. In the event that the owner has a claim in concursus with other creditors who have a lien and privilege under the provisions of this *473 act, they shall be paid in preference to the owner.”
The act then provides that if, within ten days, no one objects to the solvency of the surety, the inscription of contract, bond, and claims may be erased; but if such objection be made and it be found that the surety is not solvent, or if the owner fails to require a bond or to cause the same to be recorded, as provided by the act, he shall be deemed in default and liable as the surety would have been. It is then further provided that:
“The surety herein shall be limited to such defenses only as the principal on the bond could make.”
And that:
“The purpose of this act is to require owners to secure a bond * * * from the undertaker, contractor, master mechanic, or engineer for the protection of all parties interested in the contract, as their interests may appear, and which said surety is to stand in the place and stead of a defaulting undertaher, contractor, master mechanic, or engineer.” (Our italics.)
The owner is therefore required to file a petition, citing the contractor and his surety, and those who may have claims against them, and to “assert whatever claims he may have against any or all of them, and to require said claimants to assert their claims, and all of said claims shall be tried in concursus”; and the surety is limited to such defenses as the principal on the bond could make; and the claimants having liens and privileges are to be paid in preference to the owner, asserting a claim in such concursus.
These provisions manifestly contemplate a final disposition of the matters with respect to which the parties designated in the act are to be called together; and as the different claimants stand in about the same relation to the obligation of the surety as they do to the cash deposited by the owner, and as they would stand to cash deposited by their other debtor, the contractor, there is every reason why their claims, litigated contradictorily with each other and with their common debtors, should be, and no reason why they should not be, adjudicated at the same time and in the same proceeding; and the language of the law and the reason for it are therefore in perfect accord. The learned counsel refer to the term “reconvention,”' as found in the Code of Practice, and to “counterclaims” “offsets,” etc., as used in other jurisdictions, and argue that the claims here asserted against the surety company do not fall within those classifications, which is true. But they do not have to, since the lawmakers have given them a place or classification of their own.
It is said that there were two contracts, the one of December 2, 1909, and the other of March 8, 1910; that this bond was made March 8, 1910; and that the surety company cannot be held liable for any obligations contracted by Carey & Bro. prior to the date last mentioned, and the counsel refer to the claim of the Trussed Concrete Steele Company for steel furnished on January 15th and 21st, respectively, and deny that the surety company is liable therefor. But the contract of December 2, 1909, was for a two-story building, and, when the owner abandoned the idea of its construction and decided to erect a three-story building in its place, the steel in question was taken over under the new contract, is shown to have been used in the new building and to be unpaid for; the contractors admit that they owe for it; and the surety is “limited to such defenses only as the principal on the bond could make.”
The same thing may be said of the objection to the claim of the Otis Elevator Company for balance due for an elevator, contracted for prior to March 8, 1910, but not installed until after that date.
[8] It is said that Mrs. Aurora Sheen, widow, has no lien to secure»her claim; but the evidence shows, and it is admitted, that the money claimed is due for the hauling to the building of the material used in or for its *475 construction, and the law (O. C. art. 32491 gives a lien and privilege to “cartmen,” as well as to laborers and other workmen who have been employed in “constructing, rebuilding, or repairing houses,” etc. The act of 1906 also provides that the recording of the contract shall “create a lien and privilege on the building and ground or other work so repaired, reconstructed, erected, or constructed in favor of the said undertaker, contractor, master mechanic, subcontractor, workmen, laborer, mechanic and furnishers of materials, as their interests may appear.” Whether, therefore, Mrs. Sheen be regarded as a “cartman,” or “other workman,” or as a subcontractor, and whether the material hauled by her was used in or for the construction of the building, she is entitled to her lien and privilege.
It is objected that there is no evidence that the material, for which the Grasser Contracting Company claims $7.50, was used in the building in question, and the objection is well founded and must be sustained.
It is also objected that the amount due to Fritz Jancke, Incorporated, is overstated and should be reduced from $3,482.01 to $3,452.-16; but, though the manager stated that the amount due at one time was $3,452.16, he also stated that other material was furnished afterwards, and that the attested account, showing an indebtedness of $3,482.01, was correct.
Plaintiff should therefore pay into court the following additional amounts from the balance called for by the contract, to wit: $1,085 retained for demurrage; $11.60 paid Albert Weiblin Marble & Granite Company; $22.50 paid Leovy Plumbing Company; $12 paid S. Nosacka & Son; $39 paid Jno. T. Pender; $115 paid J. Joachim Company, Incorporated; $14.75 paid Douglas Electrical Construction Company; $11' paid H. ' W. Bond & Bro.; $275.35 paid S. A. Calongne & Son; and the further sum of $90, being the aggregate of several amounts due to W. T. Carey & Bro. for extra work and material — making a total of $1,675.95; and it should be allowed to retain the remaining $2,974.78 out of the $5,920.94, balance called for by the contract at the date of the contractor’s default, and should have judgment against Walter T. Carey & Bro. and Walter T. Carey and Thomas Carey, Jr., and the National Surety Company, in solido, for $1,-085 due it for demurrage, with legal interest thereon from judicial demand, said amount to be paid from the amounts paid and to be paid into court and recoverable on the bond, after the claims of the furnishers of labor and material shall have been paid.
The claim of the Grasser Contracting Company, as against the surety company and the fund in court, should be dismissed as in case of nonsuit.
And the judgment appealed, from should be reversed and amended, in so far as may be necessary to make it conform to the views thus expressed, and otherwise affirmed; the costs of the appeal to be paid from the fund on deposit and to be deposited.
And it is so adjudged and decreed.